OPINION AND JUDGMENT ENTRY
This is an appeal from the judgment of the Lucas County Court of Common Pleas denying the motion for partial summary judgment filed by appellant, Susan M. Hammer, and granting the cross-motion for summary judgment filed by appellee, Lumbermens Mutual Casualty Company ("Lumbermens"). For the following reasons we affirm the decision of the trial court.
The undisputed facts are as follows. Gregory W. Hammer died in an automobile accident on June 10, 1996. At the time of the accident, Mr. Hammer was operating a vehicle owned by Advanced Drainage Systems ("ADS") and was acting within the scope of his employment. ADS had automobile liability insurance with Lumbermens that covered Mr. Hammer.
Appellant filed suit against tortfeasor John Starr, The Cincinnati Insurance Company ("Cincinnati"), Mr. Hammer's unin sured/underinsured ("UM") carrier, and Lumbermens.[1] Prior to trial, appellant and Lumbermens each filed a motion for summary judgment requesting the court to determine whether appellant was entitled to recover UM coverage from Lumbermens. The trial court declared that appellant was not entitled to UM coverage from Lumbermens because ADS had rejected such coverage. At trial, the jury awarded appellant $2,000,000 for the wrongful death claim. Thereafter, appellant settled with Starr for the sum of $1,100,000. Appellant also stipulated that she settled with Cincinnati.
Following disposition of all claims, appellant timely appealed the decision of the trial court denying her motion for summary judgment and granting Lumbermens' motion. In her appeal, appellant raises the following assignments of error:
APPELLANT'S ASSIGNMENT OF ERROR NO. 1:
 "The trial court erred in granting Lumbermens Mutual Casualty Company's cross-motion for summary judgment on Susan M. Hammer's declar atory judgment action."
 APPELLANT'S ASSIGNMENT OF ERROR NO. 2:
 "The trial court erred in denying Susan M. Hammer's motion for partial summary judgment on her declaratory judgment action against Lumbermens Mutual Casualty Company."
 APPELLANT'S ASSIGNMENT OF ERROR NO. 3:
 "The trial court erred in denying Susan M. Hammer's motion for reconsideration of opin ion and judgment entry."
Additionally, Lumbermens cross-appeals and raises the following cross-assignments of error:
"APPELLEE'S CROSS-ASSIGNMENT OF ERROR NO. 1:
 "The trial court's summary judgment should be alternatively upheld because a valid rejection for uninsured/underinsured motorist coverage was properly signed and returned for the 1996-1997 policy year before Mr. Hammer's accident.
"APPELLEE'S CROSS-ASSIGNMENT OF ERROR NO. 2:
"The judgment of the lower court should
 alternatively be upheld in that Lumbermens has the right to offset against its policy limits the $1,100,000.00 paid by the tort-feasor, John Starr."
In her motion for partial summary judgment against Lumbermens, appellant argued that ADS' policy with Lumbermens provided UM coverage by operation of law because no valid effec tive rejection of UM coverage had been made with respect to the policy in question, policy number 5ZL 800 701-03 ("policy `03'"), effective March 1, 1996 through March 1, 1997. In pertinent part, appellant argued that the rejection of UM coverage signed by ADS in 1996 was ineffective because it was signed on April 24, 1996, after the effective date of the policy.
Lumbermens asserted in its cross-motion for summary judgment that the policy at issue was a renewal policy. As such, Lumbermens asserted it was not required to re-offer UM coverage to ADS in 1996, because it had previously been rejected. Never theless, Lumbermens alternatively asserted that a rejection of UM coverage was signed for the 1996 policy. Regardless of the foregoing, Lumbermens asserted that any UM coverage available to appellant would have been entirely setoff by the tortfeasor's liability coverage.
In support of its motion, Lumbermens attached the affidavit of Terry Ackerman, ADS' manager of benefits and risk analysis. Ackerman attested that it was ADS' corporate policy to reject UM coverage wherever possible. Additionally, Ackerman stated that ADS had insurance with Lumbermens since March 1, 1992, and renewed the policy in subsequent years. According to Ackerman, the policies were denoted with a suffix, such as, "`01', `02', etc." Ackerman stated that ADS rejected UM coverage when the insurance was initially obtained in March 1992, and that ADS never requested UM coverage in writing for any of the subse quent renewal policies. Further, Ackerman stated:
 "* * * When the insurance policy approached its renewal date for March 1, 1996, I, on behalf of ADS, had direct contacts with Theresa Norman at Marsh McLennan regarding coverages which ADS wished to procure for the following policy year.
 "* * * As was our practice, we discussed those coverages, including the continued rejection of UM/UIM in all states where we legally could do so, including Ohio.
 "* * * On behalf of ADS, Marsh McLennan, as ADS' broker, prepared a binder for Lumbermens which was signed by Lumbermens underwriter, Alex Sepanski, on March 1, 1996 and also forwarded to me by Marsh 
McLennan.
 "* * * This binder reflects that UM/UIM cover age will be in the amount of `statutory,' which was a phrase which had been used in prior years and which I understood to mean that ADS was rejecting UM coverage in all states where it was legally able to do so and taking the statutory minimum where rejection was not permitted as a matter of law.
 "* * * Subsequent to the issuing of the binder, I received the offer and selection form for the rejection of UM/UIM coverage from Theresa S. Norman and executed the docu ment in the designated locations on April 24, 1996 and returned it to Ms. Norman for for warding to Lumbermens Insurance * * *.
 "* * * At the time I executed the rejection forms, the binder had been signed by Kemper, but the full insurance policy had not yet been delivered.
 "* * * I subsequently received the insurance policy with a letter from Terry Norman dated May 17, 1996. The policy contained Amenda tory Endorsement No. 9 which indicated that ADS had rejected UM/UIM coverage in all states where it was permitted to do so, which was consistent with ADS' intent, its binder, and the previously executed rejection forms."
There were several rejection forms attached to Ackerman's affida vit. The initial form, dated March 4, 1992, indicated that ADS chose to reject UM coverage. Later rejection forms, which were not dated, but referred to policy years "3-1-93 to 3-1-94" and "3-1-94 to 3-1-95", stated:
"SELECTION/REJECTION
 "Please review your policy carefully.If you choose to make any selection of a lower limit or rejection of this coverage it will apply to subsequent renewals unless you give us a written request to change your policy. * * *"
In response to Lumbermens' motion for summary judgment, appellant asserted that the policy at issue was not a "renewal" policy and that the syllabus law in Gyori v. Johnston Coca-ColaBottling Group, Inc. (1996), 76 Ohio St.3d 565, required that the rejection be received by the insurance company prior to the effective date of the policy to be effective. In support of her argument that policy "03" was not a "renewal", appellant set forth the following: (1) the policy numbers were different for each subsequent policy term; (2) the total premiums charged for policy "03" and the previous policy ("02") were enormously disparate ($674,164 for "02" and $180,307 for "03"); (3) endorse ments to "02" and "03" are markedly different; and (4) Lumbermens required ADS to execute a new UM rejection form when it purchased the 1996 policy ("albeit too late to be effective"). Appellant additionally argued that, by its own actions, Lumbermens proved that the 1996 policy was not a renewal policy. Specifically, appellant pointed out that the previous policy, "02", had its initial policy period of March 1, 1994 to March 1, 1995 extended until March 1, 1996. To extend the policy period of "02" Lumbermens used an "ANNIVERSARY RENEWAL ENDORSEMENT." Appellant argued that if the 1996 policy was truly a "renewal" policy, Lumbermens should have used an "ANNIVERSARY RENEWAL ENDORSEMENT," as it previously used with respect to "02", rather than issuing a different policy.
Lumbermens replied that R.C. 3937.18(C) did not require that a subsequent policy had to be "identical" to be considered a "renewal policy." Rather, Lumbermens asserted, R.C. 3937.18(C) only required that the named insured "rejected the coverages in connection with a policy previously issued to him by the same insurer." Furthermore, Lumbermens asserted that its own internal procedure requiring a rejection of UM coverage to be signed for each renewal policy did not create a greater duty than was required by law.
With respect to appellant's argument concerning the differences between policy "02" and policy "03", Lumbermens asserted that (1) the policy numbers are the same, except for the suffix indicating each subsequent renewal; (2) the anniversary renewal endorsement extending the coverage for "02" was not used as a renewal policy, but, rather, for a change in the effective dates of the existing policy to extend it for an additional coverage period; (3) the difference in the premiums between policy "02" and policy "03" resulted, for the most part, from a change in the manner in which ADS would pay its premium (advanced initial payment with policy "02", as compared to a "straight deductible paid by the insured" with respect to policy "03"); and (4) the changes in the policy terms were due to the laws of the various states in which ADS was covered by Lumbermens' insurance and changes in ADS' business.
In support of its reply, Lumbermens filed the affidavit of Thomas Fenner, underwriting manager for Kemper Insurance Group's national accounts. Fenner supervised the underwriting for the ADS account for policies "02" and "03". Lumbermens is one of Kemper's affiliates. Fenner attested that Lumbermens insured ADS continually with successive annual policies since March 1992, except for 1994-1996, where the initial one-year policy was extended by endorsement to cover a second year. Fenner stated that because Lumbermens insured ADS in successive years, each policy issued after the first year was a renewal policy. Fenner further stated that the only way ADS would be treated as a new insured would be if there had been a break in the coverage years where ADS obtained insurance from some other insurer. Fenner explained that the annual policies issued to ADS had the same policy number which included a suffix denoting the year of the renewal, e.g., the initial policy number was 5ZL 800 701-00; 1993-94 was 5ZL 800 701-01; 1994-96 was 5ZL 800 701-02; and 1996-97 was 5ZL 800 701-03. Fenner also explained that, with respect to policy "02", the "Anniversary Renewal Endorsement" was used to extend the policy period an additional year. Fenner stated that this form was used where the insured wished to modify the effective dates of the policy, rather than have an annual renewal. Fenner further stated that policy "03" was a renewal of policy "02" and that the differences in the particular endorse ments and premiums did not affect the fact that policy "03" was a renewal. Fenner explained:
 "* * * The premiums for an insurance policy are calculated based upon various underwriting and risk factors which, for automobiles, includes the number of vehicles in the fleet, as well as the financial arrangements for the particular policy between the insured and insurer. For instance, a significant portion of the difference in the premiums initially stated on the declarations page for Policy 02 and Policy 03 is caused by the fact that Advanced Drainage changed the manner in which its premium was calculated. For Policy 02, Advanced Drainage had used a `retro' formula for determining premiums. In this situation, claims are paid by the insurer subject to retroactive adjustment and audit of the pre miums based upon claims experience. This requires a higher initial premium because the insurer is essentially advancing funds sub ject to the subsequent audit. For Policy 03, Advanced Drainage selected to have its pre mium calculated with a straight deductible paid by the insured, thus not requiring an advancement of funds by the insurer. The difference in initial premium does not result from any difference in the general coverages extended, but the manner in which the premium will be ultimately calculated. Additionally, the premium would vary from year to year based upon the vehicles insured and states covered by the general automobile policy.
 "* * * The policies also have some different endorsements and forms for several reasons. The basic policy of Lumbermens with Advanced Drainage is based upon an Insurance Services Organization (`ISO') form which has been accepted by several states. For those states for which the general form has not been accepted, separate policies were issued. In 1994, fewer states had accepted the ISO form Lumbermens was using in Policy 02, which meant that other states were insured through separate policies. By 1996, more states had adopted the ISO policy form used by Lumbermens, which allowed them to be included in Policy 03. As more states were included in the general policy, there are additional forms for that particular state which would be required, adding to the bulk of the pol icy. Each state's forms and required endorsements also change from year to year. Additionally, from year to year, there may be changes in the insured's business that would require additional endorsements, such as the adding of additional insureds for business operations, leased properties or automobiles, or a host of other reasons. None of these changes in the endorsements changed the basic structure of the policy providing fleet cov erage for the automobiles of Advanced Drain age which has continued since 1992 through the current date.
 "* * * A written rejection of uninsured/underinsured motorist coverage was obtained from Advanced Drainage for each year since 1992. The fact that the signed rejection forms have been obtained each year has no bearing on Policy 03 as a renewal policy. A national account such as Advanced Drainage may function in numerous states across the country. As a matter of underwriting policy, simply for Kemper's internal underwriting purposes, a signed rejection is obtained each year, whether the policy is a renewal policy or not."
Upon deciding the parties' motions, the trial court found that the policy in effect at the time of Mr. Hammer's accident was a renewal policy. The trial court held that, because ADS initially rejected UM coverage in 1992, Lumbermens was not required to re-offer UM coverage to ADS at the beginning of each subsequent renewal policy period. As such, the trial court held that ADS had effectively rejected UM coverage and, therefore, appellant was not entitled to UM coverage from Lumbermens.
Following the trial court's ruling, but before trial, appellant filed "PLAINTIFF'S MOTION FOR RECONSIDERATION OF OPINION AND JUDGMENT ENTRY AND MEMORANDUM IN SUPPORT."[2] Appellant argued that even if policy "03" was a renewal policy, Lumbermens never obtained a valid, effective rejection of UM coverage from ADS for any policy year prior to the commencement of that policy year. According to the deposition testimony of Thomas Fenner none of the rejections were signed before March 1, the beginning date of each policy period from 1992 to 1996. Hence, appellant asserted that because there was never an effec tive rejection made, as required by Gyori, supra, Lumbermens had to provide UM coverage by operation of law. In opposition to appellant's motion for reconsideration, Lumbermens asserted that the requirements of R.C. 3937.18(C) had been satisfied because of the prior rejections that were signed before the 1996-97 policy year. The trial court denied appellant's motion for reconsid eration on the basis that it failed to raise any issue that was not previously considered by the court. Following the jury trial, appellant appealed to this court.
The issue before us is whether appellant is entitled to UM coverage from Lumbermens. The parties' arguments on appeal are similar to those raised in their motions for summary judg ment.
This court notes that in reviewing a summary judgment, we must apply the same standard as the trial court. Lorain Natl.Bank v. Saratoga Apts. (1989), 61 Ohio App.3d 127, 129. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).
R.C. 3937.18(A) requires that no automobile liability policy of insurance be delivered unless uninsured and underin sured motorist coverage is provided. This coverage is mandatory; however, an insured can reject UM coverage, pursuant to R.C.3937.18(C), so long as the rejection is made knowingly and expressly. Abate v. Pioneer Mut. Cas. Co. (1970), 22 Ohio St.2d 161,165; Ady v. West Am. Ins. Co. (1982), 69 Ohio St.2d 593, 597. Absent a knowing and express rejection, coverage is provided by operation of law. Id. Moreover, to demonstrate a knowing and express rejection, the Ohio Supreme Court has held that both the offer to provide coverage, as well as any rejec tion, must be made in writing. Gyori, 76 Ohio St.3d 565, paragraphs one and two of the syllabus. The burden is on the insurance company to demonstrate that a customer knowingly rejected the coverage. Ady
at 597; Gyori at 567.
Once UM coverage has been rejected, unless later requested in writing by the insured, the insurance company need not provide UM coverage in subsequent renewal policies:
 "* * * Unless the named insured requests such coverages in writing, such coverages need not be provided in or supplemental to a renewal policy where the named insured has rejected the coverages in connection with a policy previously issued to him by the same insurer. * * *" Former R.C. 3937.18, revised 9-3-97.
It is axiomatic, therefore, that if UM coverage need not beprovided when it has previously been rejected, unless requested in writing, then it also need not be offered or rejected for any renewal policy thereafter. Hence, we find that once an insured has rejected an initial offer of UM coverage, an insurer is not required to re-offer UM coverage, or obtain an additional rejec tion, for any renewal policy thereafter. See Hoskins v. StateFarm Mut. Auto. Ins. Co. (1986), 26 Ohio St.3d 87, 89. See, also,Stacy v. Nationwide Mut. Ins. Co. (Feb. 27, 1998), Erie App. No. E-96-053, unreported. Even though Hoskins concerned former R.C.3937.181(B), and despite appellant's assertions that it should not be relied upon in this case, we find that Hoskins is instructive. The issue, therefore, becomes, what is a renewal policy.
"Renewal policy" is not defined by the Ohio Revised Code. However, R.C. 3937.18(C) clearly did not require that a subsequent policy had to be identical to the initial policy in order to be considered a "renewal policy." To the contrary, R.C.3937.18(C) merely stated that UM coverages need not be provided, unless requested, "* * * where the named insured has rejected the coverages in connection with a policy previously issued to him by the same insurer." Moreover, we have previously held that a policy is a renewal policy even though the covered vehicle was changed throughout the years of coverage. See Stacy, supra.
Appellant asserts that a new contract number consti tutes a new policy, not a renewal policy. In support of her argument, appellant relies on Rice's Auto Leasing, Inc. v. LeePaull Ins. Agency (Aug. 20, 1986), Clark App. No. 85-B-35, unreported. In Rice, the court held that successive fire insurance policies constituted "new" contracts, not one continuous policy. However, appellant's reliance on Rice is misplaced. Although Rice concerned fire insurance, the case relied upon by that court was Benson v. Rosler (1985), 19 Ohio St.3d 41, which concerned UM coverage. In Benson, the insurer issued three successive policies, in effect for six months each, after a change had occurred in the law regarding UM coverage. In deter mining whether the change in the law applied to the policies, the Ohio Supreme Court held:
 "We determine the language of these policies to constitute term coverage and, at the expi ration of the six-month period with the com pany's subsequent acceptance of the premiums, there was a new contract of insurance coverage entered into by the parties. Appellants renewed the policies herein three times before the automobile accident occurred on November 13, 1981." (Emphasis added.) Benson, supra, at 44.
Hence, even though the Ohio Supreme Court considered the succes sive policies to be new contracts, they were also considered renewal policies. Accordingly, we find that Rice is inapplicable to the present action, as it concerns fire insurance, not UM coverage, and, in any event, does not support appellant's conten tions.
Based on the foregoing, we find that where an insurer provides an insured liability coverage, all subsequent, consecu tive liability policies issued to the same named insured are "renewal" policies for purposes of R.C. 3937.18(C).
In this case, the witnesses testified that Lumbermens provided ADS with continuous liability coverage since 1992 and stated that policy "03" was a renewal policy, not a new policy.
Appellant asserts that the differences in the policies created a genuine issue of material fact concerning whether policy "03" was a "renewal policy." We disagree. Because there was continuous liability coverage provided, we find that policy "03" was a renewal policy, despite the changes in coverage terms, vehicles covered, premiums paid, and the like. Additionally, we find that Lumbermens' attempt to get a rejection from ADS each year did not cause the subsequent policies to be new policies. Lumbermens' internal procedure did not increase its duty beyond that required by law.
As a renewal policy, if UM coverage was previously rejected, Lumbermens was not required to re-offer coverage or obtain a rejection for policy "03." See Hoskins, supra, andStacy, supra. Hence, the question becomes, was there a valid, effective rejection of UM coverage prior to March 1, 1996.
Appellant asserts that there was no valid rejection of UM coverage because Gyori, 76 Ohio St.3d 565, requires that a rejection of UM coverage must be received prior to the policy period to be effective. Gyori at paragraph two of the syllabus, provides:
 "In order for a rejection of uninsured motor ist coverage to be expressly and knowingly made, such rejection must be in writing and must be received by the insurance company prior to the commencement of the policy year." (Emphasis added.)
In particular, appellant asserts that, although Lumbermens received a rejection from ADS during each policy period, 1992 through 1996, the rejections were never received prior to the commencement of the policy period for each year and, therefore, none were ever effective. We disagree.
The Eleventh and Eighth District Court of Appeals were faced with a similar issue. See Hillyer v. State Farm Ins. Co.
(June 26, 1998), Lake App. No. 97-L-031, unreported; Hillyer v.State Farm Ins. Co. (Dec. 18, 1998), Lake App. No. 97-L-031, unreported (reconsideration of June 26, 1998 opinion); and Hillyerv. State Farm Mut. Auto Ins. Co. (Jan. 14, 1999), Cuyahoga App. No. 75073, unreported.[3] All three cases dealt with the same accident. In the Hillyer cases, there were several policies at issue. The insured had obtained automobile coverage in separate policies in 1979 and 1981, and, in March 1990, the insured was issued an umbrella policy. The insured decided that he no longer wished to have UM coverage and, in April and December 1990, executed rejections of UM coverage as to each policy. The rejection provided:
 "In keeping with the laws of my state, I have been offered the opportunity to purchase Uninsured/Underinsured Motor Vehicle Cover age, and I reject the opportunity to purchase this option as part of this policy.
 "I understand that this rejection will apply to this policy, any current and future renew als of this policy, and all replacement poli cies until I make a written request to add this coverage." Hillyer (Dec. 18, 1998).[4]
The policies were renewed in June 1991 and June 1993. The insured never requested reinstatement of UM coverage. The accident occurred on November 6, 1994, during the 1993 to 1995 renewal terms of the policies. Like appellant in this case, inHillyer, appellants argued that because the rejections of UM insurance were not received prior to the "commencement" of the policy years, then they were ineffective pursuant Gyori. Both the Eleventh and Eighth District Courts of Appeal rejected appellants' argument. Hillyer (Jan. 14, 1999) held:
 "In reliance on Gyori, appellants essentially contend that because appellant did not reject the policy at the beginning of the policy year, then his rejection of the UM/UIM coverage is void ab initio. We do not agree. The record reveals that Martin Hillyer executed his rejections of the subject policies on April 4, 1990. Even if this court were to determine that these rejections were not effective during the policy period in which they were executed, we find that these rejections would certainly have been effective when the policies each renewed both in June 1991 and, yet again, in June 1993. See Hillyer v. State Farm Ins. Co., 1998 Ohio App. LEXIS 2930 (June 26, 1998), Lake App. No. 97-L-031, unreported."
Hillyer v. State Farm Mut. Auto Ins. Co. (Jan. 14, 1999), Cuyahoga App. No. 75073, unreported.
In this case, ADS clearly intended from the first policy in 1992 to reject UM coverage. The first rejection for the March 1, 1992 to March 1, 1993 policy period was signed on March 4, 1992. Since that initial rejection, ADS signed a rejection form during every policy period thereafter. The subsequent rejections provided that they would "apply to subse quent renewals unless [the insured gave Lumbermens] a written request to change [the] policy." Hence, even if the initial rejection in 1992 was not effective for that policy period, because it was signed after the effective date of the policy, see Gyori, we find that the initial rejection, as well as all subsequent rejections, prior to 1996, would certainly be effective with respect to policy "03" entered into on March 1, 1996.
Appellant asserts that ADS could not reject UM coverage before such was offered. Appellant's argument, however, assumes that coverage had to be offered at the beginning of each policy period. This is not the case with renewals. Initially UM coverage was offered, ADS later rejected that offer. Even if it was not effective for that policy period, because of Gyori, it would still be a valid rejection that would be effective for later renewal policies.
In summation, we find that UM coverage was effectively rejected by ADS. We further find that policy "03" was a renewal policy. Because UM coverage had already been rejected in connec tion with a policy previously issued to ADS by Lumbermens, we find that Lumbermens was not required to re-offer UM coverage to ADS in connection with its 1996 renewal policy. See R.C. 3937.18(C);Hoskins, supra; and Stacy, supra. There are a number of other arguments asserted by both parties concerning the effectiveness of ADS' rejection of UM coverage; however, based on our ruling, we need not consider those arguments.
Accordingly, we find that the trial court correctly granted Lumbermens' cross-motion for summary judgment and denied appellant's motion. As such, appellants first and second assign ments of error are found not well-taken. As we have considered and rejected the arguments raised in appellant's motion for reconsideration, we find her third assignment of error not well-taken. Because we uphold the decision of the trial court, Lumbermens' cross-assignments of error are rendered moot and found not well-taken.
On consideration whereof, the court finds substantial justice has been done the party complaining and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 _______________________________ Melvin L. Resnick, J. JUDGE
 _______________________________ James R. Sherck, J. JUDGE
 _______________________________ Richard W. Knepper, J. JUDGE
CONCUR.
[1] Parties stipulated that there was another vehicle involved in the accident; however, its driver was unknown.
[2] Appellant argued that her motion for reconsideration was properly before the trial court because the judgment entry granting summary judgment was not a final appealable issue, insofar as all the claims, rights, and liabilities of all parties had not reached final disposition. See Civ.R. 54(B).
[3] Discretionary appeals for both Hillyer (Dec. 18, 1998), Lake App. No. 97-L-031, unreported, and Hillyer (Jan. 14, 1999), Cuyahoga App. No. 75073, unreported, have been granted and are currently pending before the Ohio Supreme Court.
[4] The rejection language quoted in Hillyer (Jan. 14, 1999) is substantially the same.